## WATTS et al. v. WOFFORD et al.
### (No. 6689.)*

(Court of Civil Appeals of Texas. San Antonio. Feb. 15, 1922. Rehearing Denied March 22, 1922.)

**1. Appeal and error ⟷883 — Party treating motion for instructed verdict as demurrer bound.**

Where plaintiffs moved for instructed verdict on ground that testimony adduced by defendants was insufficient to sustain their claim against estate and stated they had no further testimony to offer, and defendants indorsed on such motion their joinder in the alleged demurrer, and the attorneys proceeded with the argument, the plaintiffs by their acquiescence became bound in treating the proceedings as a demurrer.

**2. Appeal and error ⟷1061(4) — Treating motion for directed verdict as demurrer held harmless.**

Plaintiffs were not injured because their motion for an instructed verdict was treated as a demurrer, where they had no further evidence to offer and the result would have been the same if the jury had not been dismissed.

**3. Appeal and error ⟷766—Technical breach of rules disregarded where record raises question of fundamental error.**

Where the record raises the question of fundamental error, appellants will not be denied the benefit of their theories and authorities cited by reason of technical violation of rules concerning briefs.

**4. Executors and administrators ⟷202(1) — Claims must be supported by consideration.**

A claim against any estate must be based upon a valid obligation supported by a consideration deemed valid in law.

**5. Executors and administrators ⟷239—Burden on persons attacking claim to show its vices.**

On certiorari to set aside an order of the probate court establishing a claim against an estate more than two years after its allowance, the burden is upon the petitioners to show its vices.

**6. Trusts ⟷35(4)—Equitable title remained in grantor conveying land to permit grantee to negotiate loan after which he should reconvey.**

Where land was conveyed so that grantee could negotiate a loan thereon to secure money for his immediate uses, promising to reconvey and discharge liens, the absolute legal title did not pass, as between the parties, unless by repudiation on the part of the grantee it became barred by limitations.

**7. Frauds, statute of ⟷74(2)—Verbal agreement to reconvey enforceable under statute.**

Where mother conveyed apparent legal title to son to enable him to negotiate a loan to secure money for his uses, his verbal agreement to reconvey could be shown under the statute, which was satisfied by the conveyance to the son.

**8. Novation ⟷3—Promise to pay indebtedness to third person held supported by consideration.**

Where mother conveyed land to son to enable him to obtain a loan thereon for his purposes, in consideration of his promise to pay off liens and reconvey, and the mother requested the son to pay to a daughter a certain sum of money instead of reconveying, his promise to do so was supported by a valid consideration.

**9. Limitation of actions ⟷48(3), 103(2) — Claim against one conveyed property in trust held not barred by limitations.**

Where mother conveyed land to son to enable him to borrow money for his own uses, in consideration of his promise to reconvey, limitations did not run against the right of the mother to recover the property until he repudiated the trust, or prior to a sale of the land as against a third party to whom he promised to pay a certain amount of money on sale of the land instead of reconveying to the mother.

**10. Executors and administrators ⟷202½—Promise to pay money under agreement held enforceable against estate.**

Where one conveyed land to deceased in consideration of his promise to pay off liens and reconvey, and deceased, on request of grantor, promised to pay a certain amount of money to a third party on sale of the land instead of reconveying, the fact that he died before he was able to sell the land did not render the claim of the third party unenforceable against his estate.

**11. Executors and administrators ⟷227(1)—Claim against estate held sufficient.**

Statement of claim against estate of one who promised to pay money under an agreement with a third party *held* sufficient to warrant its allowance by the probate court.

**12. Executors and administrators ⟷239—Responsive pleadings and evidence allowed in district court reviewing allowance of claim by probate court.**

On certiorari in the district court to review an order of the probate court establishing a claim against the estate of a decedent, the case is tried de novo, and there is nothing to prevent responsive pleadings or the introduction of evidence to support the claim, if primarily a proper claim was presented through and acted upon by the Probate Court.

### On Motion for Rehearing.

**13. Appeal and error ⟷662(4)—Statement of facts conclusive on appellate court as to evidence.**

It is the duty of the appellate court to consider all the testimony that appears in the statement of facts properly sent to the court as the evidence used in the trial below, notwithstanding a claim that part of such testimony was excluded by the lower court; such exclusion not appearing on the record.

**14. Executors and administrators ⟷221(4)—Evidence held to support claim against estate under an agreement between deceased and a third party.**

Evidence *held* to sustain a claim against the estate under an agreement between deceased

---

⟷For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

　　　　　*Writ of error dismissed for want of jurisdiction May 10, 1922.

and a third party, whereby deceased in consideration for land conveyed agreed to pay the money claimed.

Appeal from District Court, Bexar County; Robert W. B. Terrell, Judge.

Petition for certiorari by S. A. Watts and others against Buena G. Wofford and others to review allowance of claim against estate of Taylor Whitsett. Judgment for defendants, and plaintiffs appeal. Affirmed.

Guy S. McFarland and W. H. Kennon, both of San Antonio, for appellants.

Lewright & Lewright, of San Antonio, and Bailey & Wallace, of Cuero, for appellees.

COBBS, J. This was a petition for writ of certiorari by appellants against appellees, filed in the district court of Live Oak county, to have reviewed and cause to be set aside an order of the probate court of Live Oak county establishing a claim of appellee against the estate of Taylor Whitsett, deceased, for $5,000. The claim, as presented for allowance, is as follows:

"To amount due to Mrs. Buena G. Wofford by said Taylor Whitsett, $5,000.00, which amount said Taylor Whitsett, on or about March 13, 1914, promised, contracted and agreed to pay said Mrs. Buena G. Wofford, for and in consideration and in satisfaction of certain equitable rights, claims and interests owned and held by said Mrs. Buena G. Wofford in and to the lands in Atascosa and Live Oak counties, Texas, which were deeded to said Taylor Whitsett by Mrs. Jane Whitsett, the mother of said Taylor and of Mrs. Buena G. Wofford, being some two thousand acres of land, or more, which interests and claims of the said Mrs. Buena G. Wofford in and to said land were recognized and admitted by said Taylor Whitsett; the said Taylor Whitsett at the time first above mentioned promising to pay said sum within a reasonable time thereafter, to wit, at the completion of a sale of lands then being negotiated by said Taylor Whitsett, to say, not exceeding sixty days thereafter. Said equitable rights and interests of said Mrs. Buena G. Wofford in and to said land arose and existed by reason of the arrangement made between said Taylor Whitsett and his mother, Mrs. Jane Whitsett, just before the latter's death, and grew out of the fact that said lands were conveyed to said Taylor by his mother, for the accommodation of said Taylor, in order that he might pledge or mortgage the same and raise money thereon, but without any actual consideration being paid by said Taylor to his mother for said land, and by reason of the understanding at the time of the deed to said Taylor by Mrs. Jane Whitsett, the equitable title to said land remained in said Mrs. Jane Whitsett."

It was sworn to, duly passed upon, allowed and established, classified and registered as a claim against said estate.

Appellants alleged that the claim was without foundation in law and no consideration shown or existed for the alleged promise, the basis of the claim, and the promise or agreement, to the extent that it concerned the transfer of an interest in lands, was with within the statute of frauds.

The case was transferred, by agreement, to and tried by the Seventy-Third district court of Bexar county.

Appellees answered by general and special exceptions, raising issue of two years' limitation in which to take case up by certiorari, and general denial. Then specially, affirmatively, and very fully set out the facts upon which the claim is predicated, to wit:

"During the years 1896 and 1897, Taylor Whitsett induced his mother to convey to him some 2,600 acres of land in Live Oak county, by her deed, absolute on its face, but intended at the time by the parties to be used by him to secure the loan of money to pay off and extend an indebtedness of his and to purchase live stock with which to operate lands belonging to himself and mother, promising his mother he would pay off said liens and then reconvey same to her. It was agreed he would hold the legal title in trust for her, with the equitable or beneficial title to remain in her until the same were released from the liens he was going to create, when the legal title would be reconveyed by him to her. He then proceeded and borrowed money on the lands for his sole purposes, benefit and use, and executed deeds of trust and mortgages thereon to secure the money he borrowed from time to time.

"He never paid off any of these liens during his lifetime, but the lands were sold by his administrator after his death, and the purchase money secured therefrom was applied to those holding the said liens. The value of his mother's equity on or about December, 1908, was estimated at about $6,000. Subsequently, on or about the 13th day of March, 1914, Taylor Whitsett, being desirous of settling his business and make payments on large sums he owed, and desirous of selling the lands or a portion thereof to relieve himself of pressing obligations, and to settle the rights, equities and claims in and to said lands, claimed and asserted, requested the permission of his mother to sell for such purposes. Shortly before the death of his mother, she desired the equities to be fixed and told him it was her will and desire that the money should be paid to her daughter, Mrs. Buena G. Wofford, and the amount agreed upon was $5,000, and she consented for him to sell the land. After the death of Mrs. Jane Whitsett, at his special instance and request, Mrs. Buena G. Wofford agreed to accept from him the sum of $5,000 upon the consummation of the sale of the land which he was then negotiating, and then and there promised, contracted and agreed with her to pay her within a reasonable time thereafter. This was never consummated, because on or about the 15th day of April, some two weeks thereafter, Taylor Whitsett died intestate."

[1] A jury was impaneled to try this case, but after hearing evidence introduced by appellees on this claim, and after the appellees closed the case, appellants made a motion for an instructed verdict, on the ground:

"That the testimony adduced by defendants was wholly insufficient to sustain the burden

of establishing the claim and requesting the court to instruct a verdict in their favor."

Then appellants stated they had no further testimony to offer. Appellees under the direction of the court indorsed upon said motion their joinder in the alleged demurrer, and the attorneys proceeded with the argument. The appellants by their silence and acquiescence therein became bound by the action of the court and appellees in treating the proceeding as a demurrer. Thereupon the court discharged the jury on account of said proceeding and then, after hearing the argument of both counsel, entered judgment establishing the said claim for $5,000 against said estate.

[2] Appellants, in their brief in this court, say that "The appellants offered no testimony; in fact, from the very nature of the case, could have offered none," and it is recited in the judgment:

"Thereupon, as soon as said defendants herein rested their case, they having been by the court, with consent of counsel for plaintiffs, permitted to open and close on the evidence and the argument before the jury, counsel for plaintiffs declined to offer any evidence herein and in writing demurred to said evidence so introduced by defendants herein in support of said claim, and, under the direction of the court, counsel for said defendants in writing joined in said demurrer to said evidence."

This demurrer to the evidence was such an admission of the facts as that the court's ruling thereon disposed of the case. Umscheid v. Scholz, 84 Tex. 273, 16 S. W. 1065; Eberstadt v. State, 92 Tex. 94, 45 S. W. 1007. Under the direction of the court the issue was joined on the demurrer, and appellants made no objection thereto, and by the action of all the parties it was made a demurrer to the evidence. But appellant was not injured by that proceeding, if it be treated as a motion to instruct, because appellants said they had no evidence to offer, and, if the jury had not been dismissed, the result would have been the same.

[3] Appellees make strenuous objections to our considering the brief of appellants, on the ground that it is not in compliance with the rules prescribed in such cases. There is much merit in the objections, but the record raises the question of fundamental error, and we will apply no technical objection to it that would deny to appellants the benefit of their theories and authorities cited. Schaff, Receiver, v. Hill & Thompson (this day decided by this court) 238 S. W. 1037.

Appellants have attacked the ruling of the court by various assignments; but as the error, if any, is fundamental, we will consider the case for all errors assigned or otherwise presented on the face of the record.

[4, 5] It is true, as urged, a claim against any estate must be based upon a valid obligation supported by a consideration deemed valid in law. Was such presented here and supported by the evidence? We think so. Every presumption is in favor of such claim. This attack is made upon it more than two years thereafter. The burden is upon appellant to show its vices, if any. Hillebrant v. Burton, 17 Tex. 198.

[6, 7] Taylor Whitsett borrowed from his mother the use of her land, that he might take the apparent legal title in his name and negotiate a loan thereon to secure money therefrom for his immediate uses, promising so soon as he would be able to raise money to pay off the loans he would reconvey it to her, but that the equitable title should remain in her as security for the return of the money. Clearly, as between her and her son, the absolute legal title never passed out of her, or ever would, until it might, by repudiation on the part of her son, become barred by the statute of limitation, and it would, as a matter of course, be valid in favor of those who advanced the money for the purposes stated. Her son held the legal title for his mother in trust. Such an agreement was not in violation of the statute of frauds. It was based upon a valuable consideration, for the use of his mother's land, which he held in trust for her, to be reconveyed when he shall have paid off the liens placed thereupon by him. The land was shown to have been worth more than the claim for $5,000 presented against his estate. His mother, as she did in pursuance of her will and desire, required him to pay the debt owing to her to her daughter, his sister, for the reasons given, to which he in his lifetime agreed, obligated, and bound himself by his promises to his mother and sister to do. Can it be said, had the mother lived, and her son, Taylor, having paid off the loans, she could not, upon his refusal, have compelled him to reconvey the land? Stafford v. Stafford, 29 Tex. Civ. App. 73, 71 S. W. 985. Or have established the agreed debt and secured a foreclosure of the lien on the land to which he held the title for her benefit?

There is nothing in the statute of frauds against the enforcement of this claim. The statute was satisfied by the conveyance of Mrs. Whitsett to her son, Taylor Whitsett. Stafford v. Stafford, supra; James v. Fulcrod, 5 Tex. 512, 55 Am. Dec. 743; Doggett v. Patterson, 18 Tex. 163; McKinley v. Wilson (Tex. Civ. App.) 96 S. W. 112; Ware v. Jones (Tex. Civ. App.) 233 S. W. 357.

[8] Such contracts, however, would not be void. Shortly before his mother's death and in a very short time before his own death, he was making efforts to sell the lands to pay off his indebtedness, and his mother, in making the agreement which seems a part of the transaction, required him to agree that he would pay the agreed value of the land, to wit, $5,000, to Mrs. Wofford, to whom she desired the money to go. No one can deny that the mother was within her own

rights in making this provision for her daughter. She was acting within the full scope of her rights, and he was, in good faith and in good morals, upon a valid considera- tion, binding himself to perform the obliga- tion. For him to have acted otherwise and repudiated the obligation to a trustful mother would have been unconscionable. If such contracts are not favored, still they are not void, and still would be sufficient to support a new promise. Cotton States Build- ing Co. v. Jones, 94 Tex. 501, 62 S. W. 741.

[9] The claim was presented and duly ap- proved by the judge of the county court and was not void on its face, and not subject to be denounced as prohibited by the statute of frauds or barred by the statute of limitation. The contention of appellee, and so pleaded, is that, under article 733, R. S., this proceed- ing should have been brought within two years after the action of the probate court thereon. Appellants' answer to that is that one of them is a minor, but offered no proof to sustain it.

[10] The pleadings and proof show a bind- ing claim against the estate. Garrett, Adm'r, v. Gaines, 6 Tex. 435. Taylor Whitsett had the use and benefit of his mother's land and owed her for it. They adjusted the matter by giving the right to her son to pay off his debts. Up to that time she only allowed him to borrow money on it. By this agree- ment, just before their deaths, they altered the terms of the original agreement by re- quiring him to pay his sister the amount agreed upon as its purchase price, $5,000, in case he sold the land in pursuance of his mother's permission, and that makes no dif- ference if the sale was not made before his death by him; but it was sold to pay off the liens thereafter, which entitled her to the fixed amount agreed upon.

[11] Now, the basis of this suit was pre- sented by Mrs. Wofford in a claim growing out of a transaction between the mother and son, as related, and the statement of the claim so presented and allowed is sufficient. Altgelt v. Elmendorf (Tex. Civ. App.) 86 S. W. 41; Garrett, Adm'r, v. Gaines, supra.

[12] Complaint is made that appellees did not rely wholly upon the claim as presented for allowance in the probate court, but plead- ed affirmatively independent facts forming the basis of the claim unsworn to. We see no error in this procedure. The claim filed in the probate court is the one looked to as the foundation of this suit, and it is sufficient for that purpose. Altgelt v. Elmendorf, supra. Such trials in the district court are de novo, and there is nothing to prevent responsive pleadings or the introduction of evidence to support the cause of action, if primarily a proper claim had been presented through and acted upon by the probate court.

We find no reversible error in the ruling of the court, and the judgment is affirmed.

### On Motion for Rehearing.

In paragraph 10, paragraph 11, paragraph 12, paragraph 13, and paragraph 14, cover- ing some 14 pages of the motion, appellants attack the statement of the case as findings of fact. The matters objected to in those paragraphs of the motion are not the find- ings of this court at all, but comprise a statement of the issues as presented by the claim, the statement of the case and largely copied from appellee's pleading, but we omitted to inclose same within quotation marks, or introduce with an "as follows" so no misconception might arise. That we have now done. Surely, the appellants were sufficiently informed of the appellee's claims, as presented by this court in a statement of the case, to distinguish between it and the findings of the court. This perhaps may have misled the appellant into his confu- sion of the statement of the issues, set forth in the claim itself sued upon and the pleading, as our findings. Our opinion be- gan after the statement of the judgment of the trial court, as is usual in opinions of appellate courts.

In the assault on the opinion of this court, the learned counsel who drafted the mo- tion said:

"It may not be improper to state here, al- though it is, of course, not shown by the rec- ord, that upon objection the trial court exclud- ed testimony from Mrs. Wofford, the claimant, with reference to an alleged agreement or un- derstanding between Mrs. Whitsett and her son."

Then, continuing, says:

"Yet we have the unheard of situation, we believe, of the trial court correctly excluding the only testimony offered bearing upon the alleged agreement, and the appellate court nevertheless finding that the agreement was made and all of the details of it."

This criticism and rebuke to this court does not stop here, but continues with fur- ther prolix immaterial amplification.

[13] It is inconceivable how counsel can afford to make such observations and thus endeavor to get this court to refuse to con- sider testimony that he, himself, says was not shown by the record excluded, and es- pecially so as they themselves signed and approved the statement of facts presenting this testimony. We desire to remind coun- sel that it is our duty to consider all the testimony, one way or the other, that ap- pears in the statement of facts properly sent to this court as the evidence used in the trial below. There is nothing in this record to show why her testimony should have been excluded or why we should not consider it. It was relevant, material, and properly before us.

The record, either in direct language or inferences drawn therefrom clearly sup-

ports the claim as alleged, and certainly as proven.

[14] In view of the fact that so much has been said and urged in this motion that is misleading. and not a fair treatment of the case as to this court, we will set out some portions of the ·salient testimony supporting the claim. First, we make reference to the deeds in the record, from Mrs. Jane T. Whitsett to Taylor Whitsett, the first dated 18th day of May, 1896, and the second, 12th of July, 1897, and the two deeds of trust following, by Taylor Whitsett to John A. Green, trustee, and to J. R. Daugherty, trustee, the first, dated 20th day of April, 1897, and second, 26th day of July, 1897. All appertaining to the land Mrs. Whitsett conveyed to her son and which he mortgaged and under which foreclosure was subsequently had. This was the inception of the obligation of Taylor Whitsett to his mother. Though the deeds do not show the real consideration that the land was loaned to him, it is clearly and satisfactorily proven by all the circumstances and the declarations of himself against his interest to many persons. It being a fact case, the facts are well proven and sufficiently support the allegations of the pleading and the claim as set out above and as held in our original opinion. In partial support thereof, we set out part of the testimony of the several witnesses, as follows:

Jourd Campbell testified:

"Taylor Whitsett talked to me a great deal about business matters, and at one time he told me he was indebted to his mother. I do not remember any of the details of that conversation, except that I just remember him telling me he was indebted to his mother. * * * I have testified that Mr. Whitsett talked to me frequently about his business affairs, and that several years ago he told me he was indebted to his mother. * * * I never paid much attention to it, but I do remember him stating that he was indebted to his mother. It may have been four or five years before he died when he told me that. * * * I will state that I never paid any attention to it, other than he said to me, some years before his death, that he was indebted to his mother; it seemed to distress him, and he never mentioned it to me but once."

Mrs. Buena G. Wofford testified:

"I was present when my mother agreed to give Taylor Whitsett deeds to this land, but I was not present when any deed was signed or delivered. * * * He was at my house during his mother's last illness. When we found out she was seriously sick we sent for him, and he came. She was taken sick, I believe, on the 22d of December, and she died on the 1st day of January, and Taylor was there during her last illness. After that he would come and visit me every few months, * * * and we were together as much as I could be with him, all the time he was there, and I had a conversation with him at that time in relation to his business affairs. During the 17 or 18 years that my mother resided at my home, she had no other home during that time; she always claimed my house as her home. * * * She did not pay me any board; they just sent her money for her clothing, and money to spend when she wanted to go anywhere. I furnished her board and support. My mother was at my house in 1896 and 1897, living with me. I know of my own personal knowledge that my mother did not receive any considerable sum of money about 1896 or 1897 from any source."

Mrs. Gillie Tully testified:

"My uncle, Taylor Whitsett, was also present when my grandmother died, and I heard a conversation between my uncle, Taylor Whitsett, and my grandmother, Mrs. Jane Whitsett. My grandmother asked me if I would go and find Uncle Taylor; she said she wanted to talk to him. She was in bed then. That was just three days before she died. I went to find him, and when I started out of the room she asked me: 'Will you come back in here? I want you to hear what I have to say to Taylor.' I told Uncle Taylor, and then I came back in the room with him, and she said, 'Taylor, I am never going to get out of bed, and, if I don't, I want you to see that Gillie gets all of my estate,' and he said, 'Mother, I will.' When Grandmother asked Uncle Taylor to see that my mother got her estate, he said he would, and he then asked her, 'Mother, is there any one else that you want to get a part of your estate?' and she said, 'No, I don't want any one else.' She said, 'Gillie has taken care of me almost as long as I have taken care of her before she married,' and she said, 'I want her to have everything.' She said, 'I think she deserves it.' That is the conversation they had at the bed. Uncle Taylor had sat down on the floor by her bed. I think that conversation took place about three days before my grandmother died, and it occurred at my mother's house. I cannot think of anything else that either of them said on that occasion, except that Uncle Taylor told her he would see that my mother got it. He said, 'I will see, Mother, that she gets it,' and he told her, 'Don't you worry about it,' and then he afterwards asked her, he said, 'You don't want Sister to have any of it?' and she said, 'No, I have lived with Gillie, and I think she ought to have it,' and then he just began to talk to her about other things, because she had only been cool of fever for two days, and he did not want to worry her, and they began to talk about other things. I have given you the substance of the entire conversation."

E. A. Tully testified:

"He went on to say that he was very anxious to make a trade and sell some land, because he owed some money that he was anxious to pay, and he spoke of owing Mrs. Wofford, his sister, $5,000, and said he hoped to be able to sell enough land to pay that, and some other debts that he mentioned he owed. * * * He told me that he had been out to see his sister, Mrs. Wofford, and had told her he was going up there to sell this land so he could pay her this $5,000 he owed her. * * * I also had a conversation with Mr. Taylor Whitsett in which he told me some things in regard to the business affairs between himself and his mother,

Mrs. Jane Whitsett. He spoke of that to me down at his ranch once, and he also spoke of the same thing there at my home when he was talking about selling his land. He told me that he wanted to pay his sister this money, because he had promised his mother he would do it, and that he owed it to his mother, and that he promised to pay it. He had also at other times told me that his mother had deeded him some land. He spoke about this several times on different occasions, but I can't remember just what dates they were. He told me that his mother had deeded over her land out there to him, and that he had asked her to do it so that he could borrow some money on it; that he owed some money on the land, and he wanted more money with which to buy some cattle, and that is why he asked his mother to deed him the land she had there. He stated that he deeded it to him, and he had told her he would deed the land back to her or pay her for it, or something to that extent, when he could. * * * Previous to his death, Mr. Taylor Whitsett told me that he had been out to see Mrs. Wofford before he went to Shiner; and that he had promised her he would pay her $5,000 just as soon as he could sell his land, and he thought he had found some man at Shiner who would buy some land from him."

Mr. W. H. Sartain testified:

"He has talked to me about his business a good many times here in San Antonio, and when I was down at his ranch he told me how he got a part of the land. He told me he got it from his mother, but he did not say how much he had paid for it. As well as I remember, he stated that he either gave her a note for it, or was going to give her a note for it; I don't know which."

C. W. Wofford, Jr., testified:

"He told me that the purpose of his trip to Shiner was to sell some land, and he talked to me on that occasion about his business. He said he owed a lot of money, and he wanted to sell his land and pay it out. He said he owed Mr. Chandler, and he said he owed my mother, and he wanted to pay them both off. He said he owed my mother $5,000. He said he wanted .to sell as much of his land as he could, in order to pay her; that he had owed her a good while, and wanted to pay it off."

Ed James testified:

"There were 3,400 or 3,500 acres in the ranch, and he told me he thought he could sell it for $13 an acre. He told me that a part of that land belonged to his mother, and that he owed her $5,000 for it, and that her dying request was for him to pay the $5,000 to his sister, Mrs. Wofford, and he said as soon as he could sell some land he intended to pay it."

We know of no fact better proven, and appellant graciously rather concedes the opinion presents a correct statement of the law. At any rate, there is nothing new presented in the motion. There is abundant proof to establish the claim and no better proof offered than that by the deceased, himself, found in many declarations against his own interests.

Ed James, a witness, as shown above, said he told him part of the land "belonged to his mother and that he owed her $5,000 for it and that her dying request was for him to pay the $5,000 to his sister, Mrs. Wofford."

And E. A. Tully also testified, as above, that he said that his mother deeded it to him so that he could borrow money on it as he owed some debts and wanted money with which to buy some cattle.

It is inconceivable how any one can be found to say Mrs. Wofford's claim for the $5,000 has not been substantiated by proof, when the deceased, himself, was always proclaiming it and declaring his desire to carry out his dead mother's wishes and her almost dying request.

The motion for a rehearing is overruled.